**GEHLING, Rose, Administratrix of the Estate of Earl H. Gehling, deceased and Gehling, Rose and Gehling, Earl on their own behalf, Appellants,**

v.

**ST. GEORGE'S SCHOOL OF MEDICINE, LTD; and Foreign Medical School Service Corp. individually and t/a St. George's School of Medicine.**

No. 84–5865.

United States Court of Appeals,
Third Circuit.

Argued Aug. 7, 1985.

Decided Sept. 27, 1985.

**540**

Neil Peterson (argued), Greitzer & Locks, Philadelphia, Pa., Lawrence D. Levin, Shor, Levin & Weiss, P.C., Elkins Park, Pa., for appellants.

Kathleen Bilotta (argued), Kevin A. Palmer, Butera, Beausang, Moyer & Cohen, King of Prussia, Pa., for appellees.

Before ALDISERT, Chief Judge, STAPLETON and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

In this diversity action we are called upon to decide whether St. George's University, School of Medicine, a corporation whose principal place of business is Grenada, West Indies, has sufficient contacts with Pennsylvania to subject it to personal jurisdiction in that state. Appellants brought a wrongful death action, alleging,

inter alia, negligence, breach of contract, fraudulent misrepresentation, and intentional infliction of emotional distress, after their son, a student at St. George's, died after running in a school-sponsored road race on Grenada.[1] The court below granted appellees' motion to dismiss for lack of jurisdiction. We affirm the district court's order except insofar as it dismissed the claims for fraudulent misrepresentation and intentional infliction of emotional distress.

Earl H. Gehling, a Pennsylvania resident, was accepted by St. George's for admission on December 14, 1978. After participating in a road race on April 18, 1982, he collapsed and subsequently died. Appellants allege that in addition to negligently supervising the race, appellees provided inadequate emergency services. Appellants further allege that appellees performed an unauthorized autopsy on decedent. Finally, appellants claim that Dr. Charles Modica, the Chancellor of St. George's, accompanied decedent to his home in Scranton, Pennsylvania, and there misrepresented the cause of death to appellees.

### I.

The concept of minimum contacts "protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). To establish *in personam* jurisdiction, plaintiffs must show that defendants have such minimum contacts with the forum state so that "... the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342,

---

**1.** Appellants also named Foreign Medical School Service Corp. as a co-defendant in this suit, but they do not contend that it is subject to personal jurisdiction in Pennsylvania unless St. George's is so subject.

85 L.Ed. 278 (1940)). In determining whether minimum contacts are present, courts focus on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977).

As explained in *Dollar Savings Bank v. First Security Bank of Utah*, 746 F.2d 208 (3d Cir.1984), we follow a two-step process to determine whether personal jurisdiction may be asserted over a non-resident defendant. We first examine whether the cause of action arises from the defendant's forum or non-forum related activities. In the case of defendant's forum related activities, "the defendant's conduct and connection with the forum State ... [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed. 490 (1980). Furthermore, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228 (1958). And, of course, the defendant's contacts must be sufficient so that subjecting defendant "to jurisdiction in a Pennsylvania forum does not offend *International Shoe*'s traditional notions of fair play and substantial justice." *Dollar Savings Bank*, 746 F.2d at 213.

If the claim arises from defendant's non-forum related activities, "the plaintiff must demonstrate that in other respects (other than contacts related to the claim itself) the defendant has maintained 'continuous and substantial' forum affiliations." *Reliance Steel Products v. Watson, Ess, Marshall & Enggas*, 675 F.2d 587, 588 (3d Cir.1982) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Under 42 Pa.C.S.A. § 5301(a)(2)(iii), in order to establish general personal jurisdiction appellants must show that appellees carry on "a continuous and systematic part of [their] general business within this Commonwealth."

## II.

We first determine whether appellants have established personal jurisdiction over appellees with regard to appellees' non-forum related activities. We therefore examine whether the appellees carried on a "continuous and substantial part" of their business in Pennsylvania. If they did, then Pennsylvania has jurisdiction for each of the causes of action alleged by appellants. If not, we must determine whether there is personal jurisdiction for the forum related activities. Appellants point to several contacts between St. George's and Pennsylvania that they contend constitute "continuous and substantial" business. For the purposes of this analysis, we assume that the Foreign Medical School Services Corporation (Foreign), a New York business related to St. George's and hired by it to recruit and then select among potential candidates for admission to the school, is an alter ego of St. George's as alleged by appellants. St. George's and Foreign solicited students by placing advertisements in the *New York Times* and the *Wall Street Journal* that principally publicized the pass rate achieved by St. George's graduates on the 1982 Educational Commission for Foreign Medical Graduates Exam. These solicitations stated that "United States and Canadian citizens may direct inquiries to" Foreign, at its New York address. Other advertisements contained scholarship and loan information. Although these advertisements were not aimed specifically at Pennsylvania residents, appellants argue that because the newspapers are circulated throughout Pennsylvania, appellees attempted to avail themselves of the Pennsylvania student market. Furthermore, appellants contend that approximately six percent of St. George's students matriculating with decedent did in fact come from Pennsylvania, and that, as a result, Pennsylvania residents annually paid several hundred thousand dollars of tuition to St. George's.

Appellants also emphasize a media swing undertaken in February, 1980 by Dr. Modi-

ca and Dr. Geoffrey Bourne, Chancellor and Vice-chancellor of St. George's, respectively. They toured nine cities, including Philadelphia, in order to "gain exposure and establish credibility among consumers and medical community constituents" for the school. St. George's University Newsletter, Vol. 3, No. 1. While in Philadelphia Drs. Modica and Bourne appeared on radio and television shows that reached, according to appellees, an audience of over 400,000. There is no evidence, however, that they attempted to recruit students during this tour.

The final Pennsylvania contact alleged by appellants is a joint international program established by St. George's and Waynesburg College. This program is memorialized in a "Memorandum of Intent to Establish a Co-operative Relationship Between St. George's University School of Medicine Grenada, West Indies, and Waynesburg College, Waynesburg, Pennsylvania, U.S.A." The Memorandum summarizes discussions between Dr. Modica and Dr. Wellington Friday, the Institutional Development Coordinator and Coordinator for International Programs at Waynesburg, held on March 24, 1980 in New York City. According to the Memorandum, the agreement would allow St. George's, then a 4½ year medical program, to offer a 6½ year program to international students who "lack the background in the sciences necessary for direct entry into the University's existing program," with Waynesburg providing two years of pre-medical training.

The Memorandum contemplated that St. George's was to recruit students residing outside the United States and Canada, screen potential students for admission, and submit a list for Waynesburg's approval. St. George's was also to "sponsor" the international students admitted to Waynesburg in the sense that it agreed to be responsible to Waynesburg for the students' tuition, housing, boarding "and other fees and charges."

This feeder program was in fact established. The record indicates that the Director of Admissions at St. George's twice traveled to Waynesburg (once on February 24, 1982) to meet with Dr. Friday and "students in the Joint International Program." The record further indicates that Dr. Friday received remuneration from St. George's, as discussed below. The record also shows that officials of the medical school traveled to Nigeria in 1982 and there informed Nigerian educators of the existence of their 6½ year international program, which a St. George's trustee described as follows:

> the program was open to Nigerians or other foreign students at or near the Advanced Level. After a 2½ year premedical course at Waynesburg, assuming they maintain at least a 2.5 grade point average and score acceptably on the MCAT examinations, they would proceed automatically into the four year medical program at St. George's University.

St. George's University Newsletter, Vol. 5, No. 1.

■■■ We note at the outset that appellants bear the burden of establishing, with reasonable particularity, the nature and extent of St. George's contacts with Pennsylvania. We conclude that they have not succeeded in showing a sufficient nexus between St. George's and Pennsylvania to subject St. George's to personal jurisdiction for claims arising from non-forum related activities.

The *New York Times* and *Wall Street Journal* are non-Pennsylvania newspapers with international circulations, and advertising in them does not constitute "continuous and substantial" contacts with the forum state. *See Reliance Steel Products*, 675 F.2d at 589. Furthermore, the fact that some of St. George's students are Pennsylvania residents does not signify a relevant business contact. Advanced educational institutions typically draw their student body from numerous states, and appellants' theory would subject them to suit on non-forum related claims in every state where a member of the student body resides. Thus, the fact that residents of the state apply and are accepted for admission to St. George's is of no moment. *See*

*Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."); *see also Reliance Steel Products,* 675 F.2d at 589; *Union National Bank of Pittsburgh v. Pankey,* 284 Pa.Super. 537, 426 A.2d 624 (1980). For the same reason, the fact that St. George's may be said to derive some percentage of its revenues from Pennsylvania residents in return for services provided in Grenada does not subject it to *in personam* jurisdiction.

*Gulentz v. Fosdick,* 320 Pa.Super. 38, 466 A.2d 1049 (1983), upon which appellants rely, is distinguishable. In that case a trucking company was found amenable to personal jurisdiction for a non-forum related cause of action even though only a small percentage of its total income was derived from Pennsylvania activities. The record indicated that the company had purposefully availed itself of the privilege of using Pennsylvania highways, and that it had done so extensively. Thus the fact that only a small percentage of the company's total income was attributable to Pennsylvania activities was irrelevant; that small percentage represented continuous and substantial business within the state. In this case the percentage of total income derived from Pennsylvania residents is similarly irrelevant. However, unlike in *Gulentz,* here the income appellees derive from Pennsylvania is not a result of in-state activities; rather it is the result of the educational services provided by St. George's in Grenada. Thus the fact that Pennsylvania residents attend St. George's is insufficient to establish personal jurisdiction over appellees. Moreover, appellees' 1980 media swing through Pennsylvania does not demonstrate continuous and substantial activity in Pennsylvania; there is no evidence suggesting that students were solicited during the tour or that the tour was part of a pattern of such visits.

Nor do we find that the joint international program instituted by St. George's and Waynesburg constitutes "continuous and substantial" business activity by St. George's in Pennsylvania. St. George's is an educational institution that provides no educational services in Pennsylvania. Waynesburg is a separate entity that runs its own educational program under the supervision of its own Trustees, Officers and faculty. While one facet of this Pennsylvania-based educational program facilitates the admission of foreign students to St. George's Caribbean-based program, nothing in the record suggests that St. George's derives any income from educational services rendered in Pennsylvania.[2]

We therefore find that St. George's lacked the continuous and substantial business relationship with Pennsylvania to support personal jurisdiction over it with regard to the out of state causes of action.

### III.

We now turn to the question of whether appellants have established *in personam* jurisdiction over appellees with regard to the causes of action which appellants characterize as arising from appellants' forum related activities. Appellants allege that an implied contract existed between decedent and St. George's requiring St. George's to exercise reasonable care to protect decedent, and that the breach of this contract resulted in decedent's death. Without analysis, appellants declare this to be a Pennsylvania contract. They point to an exchange of letters between Foreign and decedent, who was then residing in the forum state. Appellants do not suggest that the letters indicate that such an agreement was expressly reached. Moreover, they acknowledge that the alleged contract was to be performed in Grenada and that

---

**2.** The record indicates that Dr. Friday, a member of the Waynesburg College Administration, receives some remuneration from St. George's "for his efforts as a liaison between St. George's ... and Waynesburg College." The record does not indicate what that remuneration is or what those "efforts" entail, however, and thus provides an inadequate basis for evaluating the significance of this contact.

the alleged breach as well as the alleged resulting injury occurred there.

■ The documents to which we have been referred indicate nothing more than that appellants' decedent applied from Pennsylvania for admission to St. George's, that this application was accepted in Grenada, that St. George's and Foreign sent mail into Pennsylvania advising the prospective student of his acceptance and of other information concerning matriculation, and that appellants' decedent responded by mailing the requested tuition from Pennsylvania to Foreign in New York. Applying the standards set forth *supra* for establishing jurisdiction over forum-related activities, we cannot say that St. George's "purposefully availed" itself of the "privilege of acting" within Pennsylvania by mailing its letter of acceptance to decedent. Moreover, we do not believe this mailing constituted a substantial enough connection with the forum state to make reasonable an assertion of personal jurisdiction. If it were, St. George's would be amenable to suit for breach of contract, even where the breach and injury occurred in Grenada, in each state in which successful applicants resided at the time of their acceptance. We hold that this is not a permissible result under the principles enunciated in *Dollar Savings Bank*. *See Lakeside Bridge & Steel Co. v. Mountain State Construction Co.*, 597 F.2d 596 (7th Cir.1979), *cert. denied* 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980) (mailing of contract acceptance to plaintiff in Wisconsin insufficient to establish *in personam* jurisdiction in that state over defendant in suit for contract purchase price even though plaintiff's performance was to occur in Wisconsin).

■ We reach the opposite conclusion with regard to appellants' second, allegedly forum related, cause of action. Appellants claim that Dr. Modica delivered decedent's body to appellants in Pennsylvania and, while there, fraudulently misrepresented the cause of death, stating that decedent died of a perforated gastric ulcer. Appellants further claim that this misrepresentation constitutes intentional infliction of emotional distress. Having traveled to Pennsylvania to return decedent's body, appellees clearly availed themselves of the "privilege of acting within" Pennsylvania. Furthermore, with respect to this claim the appellees could reasonably have anticipated being haled into court in Pennsylvania to answer for their alleged injurious misrepresentation. Finally, the cause of action arises from defendants' in-state activities, and the defendants' misrepresentation, which occurred and caused injury in Pennsylvania to Pennsylvania residents, has a sufficient connection to meet the fair play and substantial justice standard of *International Shoe*.

## IV.

■ Finally, appellants contend that the court below erred in not granting their application for a transfer of their case to the United States District Court for the Eastern District of New York. The district court denied the application because appellees had failed "to build the requisite foundation of 'minimum contacts' to support ... [their] claim of *in personam* jurisdiction" over appellees in Pennsylvania. A271–72. Thus, the court below apparently was of the view that if it lacked personal jurisdiction over appellees, it was without power to transfer the case. We have previously held, however, that a district court lacking personal jurisdiction can transfer a case to a district in which the case could have been brought originally. *Reyno v. Piper Aircraft Co.*, 630 F.2d 149, 164–65 (3d Cir.1980), *rev'd on other grounds* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), *reh'g denied* 455 U.S. 928, 102 S.Ct. 1296, 71 L.Ed.2d 474 (1982); *United States v. Berkowitz*, 328 F.2d 358, 361 (3d Cir.), *cert. denied* 379 U.S. 821, 85 S.Ct. 42, 13 L.Ed.2d 32 (1964). On remand, the district court, if requested by appellants, should reexamine the motion to transfer.

## V.

The order dismissing appellants' complaint for lack of personal jurisdiction is

affirmed with respect to the negligence and breach of contract claims. The order dismissing appellants' complaint for lack of personal jurisdiction is reversed with respect to the fraudulent misrepresentation and intentional infliction of emotional distress claims, and the case is remanded to the District Court for further proceedings.